1

2

3

4

5                      UNITED STATES DISTRICT COURT

6                      EASTERN DISTRICT OF CALIFORNIA

7

8    STEVEN ANTHONY PACK,                    No.  1:13-cv-00585-DAD-SKO  HC

9                 Petitioner,                **FINDINGS AND RECOMMENDATION**
                                             **TO DENY PETITION FOR WRIT OF**
10        v.                                 **HABEAS CORPUS AND DECLINE TO**
                                             **ISSUE CERTIFICATE OF**
11   SUZANNE M. PEERY, Acting Warden,        **APPEALABILITY**
     California Correctional Facility, Susanville,
12   California,

13                 Respondent.

14

15          Petitioner Steven Anthony Pack is a state prisoner proceeding *pro se* with a petition for

16   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He alleges five grounds for habeas relief:

17   (1) denial of the new trial motion violated due process; (2) jury instructions on aiding and

18   abetting violated due process and the Sixth Amendment; (3) the erroneous imminent peril jury

19   instruction misstated applicable law; (4) insufficient evidence of murder violated due process; and

20   (5) the prosecutor's *Doyle*[1] error violated due process.  Having reviewed the record as a whole

21   and applicable law, the undersigned recommends that the Court deny the habeas petition.

22

23   **I.     Factual Background[2]**

24          **A.     General Information**

25          The incident giving rise to Petitioner's conviction occurred on August 18, 2007, when two

26   groups of men encountered each other in a liquor store parking lot in which taco trucks gathered.

27   _____
     [1] *Doyle v. Ohio*, 426 U.S. 610 (1976).
     [2] Factual information is derived from *People v. Pack*, 2012 WL 1958866 (Cal.App. May 31, 2012) (No. F061140),
28   and the review of the record by the undersigned.

                                              1

1   After having purchased food at a white taco truck, Petitioner, and codefendants Nicholas

2   Castenada and Jose Barajas, Jr., encountered another group (the "soccer group"[3]), which was on

3   its way home from an evening spent partying and dancing.   Petitioner and the co-defendants

4   addressed the soccer group with various insults including the term "scrap," a derogatory reference

5   to members of the Sureño street gang.   When a verbal argument ensued, Castenada pulled a gun

6   from his waistband, and a member of the soccer group attempted to calm things down,

7   characterizing the group members as "paisas" and explaining that they did not "bang."

8

9           The soccer group withdrew toward a black taco truck, and Petitioner, Castenada, and

10   Barajas got into a white Honda Civic.   Castenada backed the Civic slowly past the group at the

11   black truck; Petitioner, standing in the open front passenger door, stated, "We got you"; and

12   Barajas fired a 22-caliber revolver through the window of the back seat into the soccer group.

13   Shot in the head, Kevin Argueta fell to the ground, having incurred a fatal wound.[4]

14

15           The Civic sped away.   Garcia and Lopez gave chase in Garcia's green Honda.   When the

16   green Honda came within 37 feet of the white Civic, Barajas opened fire.   Garcia evaded the

17   gunfire and ultimately returned to the taco truck.

18           On August 22, 2007, Petitioner was arrested pursuant to a warrant.   He initially identified

19   himself to officers as his brother, Michael Pack.[5]   He also told police a false story about the other

20   two people in the car.   Barajas turned himself in after hearing a news report naming him as a

21   suspect.   Castaneda was arrested August 29, 2007.

22

23   ///

24   [3] Testimony indicated that many of the members of this group knew each other from having played together on
25   various soccer teams in recent years.   This group included brothers Miguel and Daniel Oseguera, Kevin Argueta,
     Moises Garcia, Marvin Lopez. Julio Amezcua, and Bayron Gutierrez.
26   [4] Gutierrez' finger was wounded in the altercation.   He was treated at the hospital and released.   The source of his
     wound was uncertain.   Gutierrez testified that he had been struck by a bullet; the defendants argued that he had
     simply been cut in the course of the altercation.
27   [5] A witness from the soccer group, Daniel Oseguera, originally misidentified Petitioner as Petitioner's brother
     Michael.   Viewing a photographic line-up later, Daniel Oseguera identified Petitioner as the individual who had
28   participated in the altercation at the taco trucks.

2

The white Honda Civic, which belonged to Castenada, was located in a garage with its tires and wheels removed.  Police found a live .22 caliber cartridge under the front passenger floor mat and a spent .22 caliber shell casing under the front passenger seat.

**B.      Gang Expert Testimony**

Detective Francisco Soria testified as a gang expert.  Previous testimony indicated that Castenada had claimed to be a Norteño gang member at the age of fourteen.  Soria explained his reasons for concluding that all three co-defendants were Norteños.  He opined that the shooting was intended to benefit the Norteños by punishing the victims for not backing down when confronted.  Nothing indicated that Argueta or any member of the soccer group was a member or associate of a gang.

**C.      Defense**

Each of the defendants denied belonging to a gang.  According to the defendants, they had been watching football before going to the taco truck to get something to eat.  When they arrived, Petitioner recognized two individuals in the other group (Daniel and Miguel Oseguera), whose father had been involved in an auto accident with a member of the Barajas family.  He called out, "When are you going to pay my boy his money?" but no one answered him.

At trial, the defendants testified that the soccer group had been the aggressors, stating that after the defendants bought their food and headed for the car, the Oseguera brothers and Amezcua approached them and began yelling.  The other five members of the soccer group approached from another direction to surround the defendants.  Castenada testified that when he realized that the other group was acting aggressively, he pulled out his .22 caliber revolver and told them to get back.  Defendants then got into their car and began to drive away.  Barajas fired two shots.  He testified that he fired the first shot into the ground to prove that the gun was real,

///

3

and then, after someone made a move "like he was going to lift his shirt up" to get a weapon,

Barajas fired the second shot, which struck Argueta.

**D.**     **Videotape of Incident**

The incident was captured by a security camera in front of Corona Liquors.  When shown

the video tape at trial, various witnesses identified themselves and others, and explained what was

happening.  Petitioner and the co-defendants were already at the white taco truck, opposite

Corona Liquors, when Miguel and Daniel Oseguera and Julio Amezcua arrived at 12:33:38[6] and

parked just south of the white taco truck, across from the black taco truck parked to the south of

Corona Liquors.  At 12:34:49, Petitioner stepped away from the white truck and turned to look

toward the black truck or Castenada's car, which was parked several spaces south of the black

truck.  Defendants left the white truck and began walking toward the black truck or Castenada's

car at 12:35:44, while Amezcua and the Oseguera brothers stood in front of the black truck,

waiting to place their order.  At 12:35:50, Garcia's green Honda, carrying the other members of

the soccer group, arrived from the north, drove past both taco trucks and parked in a space to the

south of the black truck.

The prosecutor pinpointed 12:36:24 as the start of the argument.  By that time, the

defendants were in front of the black truck, and the Osegueras and Amezcua had stepped away

from the truck toward them.  By 12:36:45, other people in the vicinity showed awareness of the

argument.

At 12:37:50, the back-up lights on Castenada's car appeared as it backed out of its parking

space to a point roughly even with the soccer group, which was standing near a white van parked

immediately to the south of the black truck.  The first shot was fired at 12:38:00, as evidenced by

a bystander dropping down to shelter behind his pick-up truck, which was parked in front of

---

[6] Testimony indicated the incident began at about 1:30 a.m.  The time stamp on the security tape appears to be one hour earlier (i.e., standard time rather than daylight savings time).

Corona Liquors.  By 12:38:08, the bystander had stood up, and others were fleeing the scene.

Cars were able to travel the aisle between the taco trucks toward exits at the north and south of

the parking lot.  At 12:38:17, the bystander again dropped behind his pick-up truck as one or

more additional shots were fired.  (Although not visible on the video, at this point, Argueta was

struck by a shot and fell dead behind the white van.)  Stanislaus County Sheriff's Deputies

Andrew Lawder and Cory Brown arrived at the scene at 12:42:13.

## II.   **Procedural History**

Petitioner, Castenada, and Barajas were charged with one count of murder (Cal. Penal

Code § 187), nine counts of attempted murder (Cal. Penal Code §§ 187 and 664), two counts of

assault with a firearm (Cal. Penal Code § 245(a)(2)), one count of discharge of a firearm (Cal.

Penal Code § 246), participation in a street gang (Cal. Penal Code § 186.22(a)), and various

enhancements.  Claiming that the prosecutor had failed to establish probable cause, Petitioner

moved to set aside the information pursuant to California Penal Code § 995.  Following a hearing

in January and February 2009, the trial court (Stanislaus County Superior Court) found

insufficient evidence that (1) defendants aided, abetted, or participated in a criminal street gang;

(2) the charged incident was gang related; and (3) the predicate acts were sufficient to support a

reasonable suspicion of active gang participation.  With regard to Petitioner, the trial court

dismissed count 14, charging participation in a criminal street gang; enhancements alleged under

California Penal Code § 12022.53(e)(1) in counts 1-10; and enhancements alleged pursuant to

California Penal Code § 186.22(b) in counts 1-13.

On April 10, 2009, Respondent filed a petition for writ of mandate.  On May 28, 2009, the

Court of Appeal issued the writ of mandate and directed the Superior Court to deny Petitioner's

§ 995 motion.  *People v. Superior Court of Stanislaus County (Steven Anthony Pack)*, 2009 WL

1497468 at 2 (Cal. Ct. App. May 28, 2009) (No. F057347).

During the course of 31 days in January and February 2010, Petitioner and the two co-defendants were tried jointly before a jury.  Each defendant had his own counsel.  At trial, Barajas, who had remained silent following his arrest, stated for the first time that he had shot from the white Civic into the soccer group at the taco truck.

On February 4, 2010, the jury found all three defendants guilty of second-degree murder, two counts of assault with a firearm, and negligent discharge of a firearm.  Only Castenada was found guilty of active participation in a street gang.  The jury found the defendants not guilty of two of the attempted murder counts, the count of intentionally shooting at an occupied vehicle, the gang enhancement appended to the murder charges, and gang participation.  The jury deadlocked on the other gang enhancements and seven of the attempted murder counts.  The trial court declared a mistrial on the attempted murder counts and struck the enhancements for which the jury reached no verdict.

On September 17, 2010, the trial court denied Petitioner's and Barajas' motions for a new trial.  The Superior Court sentenced Petitioner to a term of 40 years to life in prison.

Petitioner appealed the convictions to the State Court of Appeals, Fifth Appellate District, which affirmed the convictions in all regards on May 31, 2012.  The California Supreme Court summarily denied the appeal on September 12, 2012.

On April 15, 2013, Petitioner filed a petition for writ of habeas corpus in this Court.

**III.**     **Standard of Review**

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320,

322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*,

537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.

## IV.    Inflammatory Gang Evidence

As the first ground for habeas relief, Petitioner contends that the trial court violated his Fifth and Fourteenth Amendment due process rights by denying the motion for a new trial to remedy inflammatory and irrelevant gang evidence.  Although the jury acquitted Petitioner of the charge of active participation in a street gang, Petitioner argues that the gang evidence irreparably tainted the trial.  Respondent characterizes Petitioner's challenge to denial of a new trial as primarily a state law issue of evidence.

### A.    New Trial Motion

The new trial motion raised five grounds, including "4.  That defendant's federal constitutional rights to due process were violated as the prosecutorial decision to charge gang allegations and the Court's erroneous decision to permit the admission of gang evidence rendered the trial fundamentally unfair."  4 CT 1020.  Petitioner relied on *People v. Albarran*, 149 Cal. App. 4th 214, 230 (2007), for the proposition that "admission of gang evidence violates federal

due process and renders a trial fundamentally unfair where the gang evidence had no legitimate purpose being admitted at trial and rendered the trial so arbitrary and fundamentally unfair that it violated due process."  4 CT 1028 (internal quotation marks and citations omitted).

The trial court denied the new trial motion in its entirety.  The court distinguished Petitioner's case from *Albarran*, and noted that, in its earlier review of the § 995 determination, the Court of Appeal "held that there was sufficient evidence for the case to proceed to trial regarding the gang charges."  12 RT 2629.  *See Superior Court of Stanislaus County (Steven Anthony Pack)*, 2009 WL 1497468.  The trial court noted that it had excluded evidence that the prosecution had "very badly" wanted to present, even though reversal would have been unlikely if the evidence had been admitted.  It found the jury's inability to reach a verdict on the gang enhancements likely attributable to the greatly attenuated gang evidence admitted into evidence.

### B.    Court of Appeal's Decision

The Court of Appeal also distinguished this case from *Albarran*, finding that the gang evidence admitted in this case was directly relevant to proving the gang-related criminal charges. *People v. Pack*, 2012 WL 1958866 at *8 (Cal. Ct. App. May 31, 2012) (No. F061140). Accordingly, it held that, under California Evidence Code § 352, the trial court did not abuse its discretion in admitting evidence regarding Petitioner's and Barajas' participation in a criminal street gang.  *Id.*

The Court of Appeal also found that since the jury acquitted Petitioner and Barajas of the count of participating in a criminal street gang and deadlocked on the gang enhancements, it was unlikely that the gang evidence was unduly inflammatory: "If . . . the jury was not convinced of [Petitioner's] and Barajas's gang affiliations, the jury would have no reason to allow gang evidence to influence its assessment of appellants' guilt of other charged offenses."  *Id.*  Further, the jury convicted the defendants of the lesser-included offense of second degree murder rather

than first degree murder as charged. *Id.* The court held that Petitioner and Barajas failed to prove that (1) the trial court abused its discretion in admitting the gang evidence and (2) admitting the gang evidence created undue prejudice. *Id.*

### C.      No Due Process Violation

Issues regarding the admission of evidence are matters of state law, generally outside the purview of a federal habeas court. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995).

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983). "Although the [U.S. Supreme] Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375 . . . , it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101. Since the state appellate court's disposition of Petitioner's appeal was not contrary to or an unreasonable application of Supreme Court precedent, a federal district court may not grant the writ based on the trial court's admission of evidence relating to Petitioner's gang-related activities. It is recommended that the Court not reach this issue.

## V.      Jury Instructions

Petitioner contends that (1) the jury instructions on aiding and abetting violated due process and the 6th Amendment  and (2) an erroneous imminent peril jury instruction misstated applicable law. Respondent responds that neither claim is a ground for habeas relief, explaining that (1) the petition and its supporting documents do not explain why the aiding and abetting

instructions violated Petitioner's constitutional rights and (2) the defendants were not in imminent danger at the time of the shooting because all three defendants were inside the car and on their way out of the parking lot when Barajas shot into the crowd.

### A.      Federal Habeas Review of Jury Instruction Errors

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review.  "It is not the province of a federal court to reexamine state court determinations of state law questions."  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  "The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief."  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).  "[A] petitioner may not transform a state-law issue into a federal one merely by asserting a violation of due process."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) (internal quotation marks omitted).

To prevail in a collateral attack on state court jury instructions, a petitioner must do more that prove that the instruction was erroneous.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process."  *Estelle*, 502 U.S. at 72.  And even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

A federal court's review of a claim of instructional error is highly deferential.  *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993).  A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole.  *Id.*  The mere possibility of a different verdict is too speculative to justify a finding of constitutional error.  *Henderson*, 431 U.S. at 157.  "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless 'there is a reasonable likelihood that the jury has applied the challenged

instruction in a way' that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting *Estelle*, 502 U.S. at 72).

Even when the trial court has made an error in the instruction, a habeas petitioner is only entitled to relief if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637. A violation of due process occurs only when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

**B.**     **Aiding and Abetting**

    **1.**     **The Instructions**

The prosecution's proposed jury instructions included CALCRIM Nos. 400 and 401. In the charge conference, Petitioner's attorney agreed that CALCRIM Nos. 400 and 401 should be included in the jury instructions. The trial court presented jury instructions including instructions drawn from CALCRIM Nos. 400 and 401:

> A person may be guilty of a crime in two ways.
>
> One, he or she may have directly committed the crime. I will call that person the perpetrator.
>
> Two, he or she may have aided and abetted a perpetrator who directly committed the crime.
>
> A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.
>
> To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> One: the perpetrator committed the crime;

12

Two: the defendant knew that the perpetrator intended to commit the crime;

Three: before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

And four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  If you conclude that defendant was present at the scene of the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

11 RT 2382:11-2383:14.

Petitioner did not object to the trial court's inclusion of these instructions.

### 2.   State Court Decision

The state court first rejected Petitioner's claim that he was not required to object to the erroneous instruction, stating: "Current case law . . . is to the contrary, and an objection to CALCRIM No. 400 must be asserted in the trial court in order to preserve any objection for purposes of appeal."  *Pack*, 2012 WL 1958866 at *3 (citing *People v. Samaniego*, 172 Cal. App. 4th 1148, 1163 (2009)).

The court added that the error, if any, was harmless.  Petitioner's argument focused on the sentence within the instructions that stated: "A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."  *Pack*, 2012 WL 1958866 at *3.  Petitioner argued that his liability as an aider and abettor must be determined by his own mental state, not that of the perpetrator.  *Id.*

///

13

The state court agreed that under California law, an aider or abettor may be guilty of a greater or lesser homicide offense that the perpetrator himself.  *Id.* at *3-*4.  An aider and abettor's "[g]uilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state."  *Id.* at *4 (citing *People v. Nero*, 181 Cal. App. 4th 504, 513-14 (2010)).  In April 2010, after Petitioner's trial, the Judicial Council of California revised the challenged sentence in CALCRIM No. 400 to provide, in relevant part, that "[a] person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."  *Pack*, 2012 WL 1958866 at *4.

The Court of Appeal found that the trial court's use of the then-current form of the instruction was "harmless beyond a reasonable doubt," and that the jury would have reached the same verdict regardless of the inclusion of the disputed language.  *Id.* at 3. To support its conclusion, the Court of Appeal pointed out that the trial court also instructed the jury using CALCRIM No. 401, which required Petitioner to know both the perpetrator's intent to commit the crime and his intent to aid and abet the commission of the crime.  *Id.* at *4-*5.  Petitioner did not object to the language of  CALCRIM No. 401.  *Id.* at 5.  Recounting the jury's questioning the trial court during deliberations about to evaluate an individual's intent, the Court of Appeal concluded that the jury had to have considered the elements articulated in CALCRIM No. 401, including a determination of Petitioner's individual intent.  *Id.*

### 3. <u>Procedural Default</u>

When a state prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  An

adequate rule is one that is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003). An independent rule is one that is not "interwoven with federal law." *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

In this case, the federal petition repeats Petitioner's contention, originally advanced in his state appeal, that California state law deemed him to have objected to the instruction despite his actual failure to have done so.  Citing *Samaniego*, 172 Cal. App. 4th at 1162, the Court of Appeal rejected this contention as contrary to state law.  This Court is bound by the state court's determination of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  As a result, this Court is bound by the state court's determination that Petitioner failed to preserve his right to appeal by objecting to CALCRIM No. 400 at trial. 28 U.S.C. § 2254(a).

### 4.    Ineffective Assistance of Counsel

In arguing this issue, Petitioner also contends that because there could be "no plausible rational tactical purpose" for trial counsel's failure to object to the "equally guilty" language of CALCRIM No. 400, counsel's assistance was ineffective, violating Petitioner's Sixth Amendment right to counsel.  Petitioner did not raise this claim in state court.

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. *Coleman*, 501 U.S. at 731; *Rose v. Lundy*, 455 U.S. 509, 518 (1982); *Buffalo v. Sunn*, 854 F.2d 1158, 1163 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v. Connor*, 404 U.S. 270, 276 (1971);

*Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.  *Duncan*, 513 U.S. at 365; *Kenney v. Tamayo-Reyes*, 504 U.S. 1, 8 (1992).

Because Petitioner never set forth a claim of ineffective assistance of counsel or violation of the Sixth Amendment with regard to the aiding and abetting instructions, the state court had no opportunity to consider it.  As a result, this Court may not reach it.

### 5.     Harmless Error Analysis

Petitioner also takes issue with the state court's harmless-error analysis, arguing that (1) the jury convicted Petitioner as an aider and abettor; (2) the evidence did not support a finding that Petitioner ever shot at the soccer group; (3) the evidence did not support a finding that Petitioner ever had a motive to shoot anyone; and (4) the jury's questions during deliberations indicated that it greatly struggled in determining its verdict.  Characterizing the state court's analysis as harmless error misstates its decision, however, since the state court found Petitioner's failure to lodge a contemporaneous objection precluded their addressing this claim.

Despite Petitioner's arguments to the contrary, the evidence in this case did not indisputably absolve Petitioner from criminal liability. The many witnesses in this case perceived the encounter between the two groups of young men differently depending on their viewpoint and the point in the encounter in which they came upon the scene.  The brief duration of the altercation (approximately four minutes) accentuated the variety of impressions made on the witnesses.

Although Barajas testified that he fired all of the shoots from the back seat of the car, several witnesses testified that they saw Petitioner firing a gun from the front seat.  Different witnesses testified to hearing various statements in the course of the verbal dispute.  Some

witnesses testified that one or more of the defendants spit at one or more members of the soccer group; others were unaware of any spitting.  Several witnesses recalled that a member of the soccer group lunged at one of the defendants; others never saw that.

In addition, the evidence as a whole did not support Petitioner's claim that no evidence indicated that Petitioner had any hostile motive.  Petitioner relies on defense testimony that the Oseguera brothers were the aggressors and that they called in friends to assist them in the altercation. But other testimony indicated that Petitioner was the first person to notice the Oseguera brothers' arrival at the black taco truck and that he initiated the interaction between the two groups, shouting , "When are you going to pay my boy his money?"  Several witnesses testified that when Castenada drew his gun, Petitioner asked for it and threatened to "bust a cap" in a member of the other group.  Finally, Petitioner admits that, when Castenada backed his car from its parking spot, Petitioner, standing in the Honda's front door jamb, threatened the other group by saying, "I've got you."

That Petitioner would have interpreted the evidence and proceedings at trial to justify a conclusion of harmful error does not compel this Court to agree with him or to grant habeas relief.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664)).  Sufficient evidence supported the state court's determination.  The Court should not grant habeas relief based on jury instructions' articulation of CALCRIM 400.

## C.    Imminent Peril

Petitioner contends that the trial court's instruction on imminent peril obviated his defenses of reasonable and imperfect self-defense.  Specifically, Petitioner claims:

///

17

[T]he instructions said that there is no right to act defensively against a threat of "future harm," no matter how great or how unlikely that harm may be. (11 RT 2384, lines 15-16; 11 RT 2390, lines 26-27; 11 RT 2396, lines 7-8; 11 TT 2414, lines 21-22.)

An imminent peril is necessarily a threat of harm on the immediately [*sic*] but that has not yet transpired. Action in self-defense against imminent peril is necessarily action taken to prevent harm that has not yet occurred but that is expected to occur in the immediate future unless prevented by defensive action.

Doc. 1 at 28-29.

Petitioner argues that, as a result, CALCRIM Nos. 505 and 571 violated his right to due process by misstating California law.

Respondent contends that this Court cannot address the state court's construction of California law. And in any event, adds Respondent, Petitioner cannot claim imminent danger since the shots were fired when Petitioner was safely within a car that was ready to leave the scene of the argument.

### 1.   Preparation of Instructions

At trial, the wording of CALCRIM No. 505 was the subject of protracted discussion, but not with regard to the question of imminent peril. Throughout preparation of the jury instructions, Petitioner, through his attorney, Public Defender Robert Wildman, was concerned about differentiating the roles of the three defendants and distinguishing Petitioner from Barajas, whom Petitioner characterized as the shooter. Thus, on January 22, 2010, Wildman did not object to the inclusion of CALCRIM No. 505, but contended that the presence of multiple defendants, but a single shooter, required the trial court to tailor CALCRIM No. 505 to reflect that Barajas shot the gun in defense of himself and the other defendants, whose guilt was derivative of Barajas' guilt. "So since they are not the shooters, they can't say, well, I did this in self-defense," he argued. "They didn't do anything in self-defense. Mr. Barajas did it for them." 8 RT 1854. Because the prosecutor had not included the text of CALCRIM No. 505 in his proposed instructions, which had been prepared and submitted before Barajas testified that he had shot the gun, the prosecutor and Wildman agreed to work together to prepare a mutually agreeable form of the CALCRIM No. 505 instruction, tailored to reflect the facts of the case. They were unable to

1    agree on the instruction.

2         In the charge conference following the close of evidence in the trial, the prosecutor argued

3    that, in light of testimony that Petitioner had a gun and that Petitioner was a shooter, the

4    instructions could not assume that Barajas was the sole shooter, as Petitioner contended.  As the

5    prosecutor and Wildman debated the wording of CALCRIM No. 505 to reflect the facts of the

6    case, the trial court interrupted and asked whether the defendants had objections to CALCRIM

7    No. 505 other than the opening section.  Wildman replied that he had no problem "with the retreat

8    language coming out so that I have a match with everything else." 9 RT 1944:14-16.  His only

9    concern was with wording the instruction to 'pinpoint[] the theory of the defense," which

10   assumed that Barajas was the sole shooter and that "he acted in self-defense or defense of the

11   others, not that [Petitioner] did, not that Mr. Castenada did, and so they would have no aiding and

12   abetting liability to a codefendant that the jury finds acts in self-defense or defense of others."  9

13   RT 1944:18-1945:5.

14        Because the prosecution did not agree that Barajas was the sole shooter, the trial court

15   declined to modify CALCRIM No. 505.  The  trial court found that, since the jury could find that

16   Barajas, Petitioner, or both were the shooter(s), an attempt to set forth names in the instruction

17   would render it unduly confusing.

18        The following morning, after completing discussion of other instructions, the parties

19   returned to consideration of CALCRIM No. 505.  Wildman's suggested language for the self-

20   defense and imperfect self-defense instructions (CALCRIM Nos. 505, 571, 604, and 3470)

21   include pinpoint language naming Barajas as the shooter.   The prosecutor objected, arguing that

22   inserting Barajas' name would confuse the jury about how the instruction was to be applied and

23   improperly suggest facts that were not uncontroverted.  The prosecutor contended that despite

24   Wildman's attempts to deny or minimize the evidence that Petitioner was a shooter, multiple

25   witnesses testified that Petitioner had fired a gun.  And although Barajas' surprise testimony that

26   he had fired a gun required the prosecution to amend the complaint to conform to proof, it did not

27   require the prosecution to abandon its allegation that Petitioner had fired a gun.  The prosecutor

28   maintained that referring only to Barajas as the shooter, despite the evidence against Petitioner,

would foreclose the jury's fact finding role. The trial court elected to use the language submitted by the prosecution, explaining that the defense version was likely to confuse the jury.

When the charge conference reached CALCRIM No. 571, Wildman indicated that Petitioner sought the same modifications as he had requested for CALCRIM Nos. 505, 604, and 3470. The trial court similarly declined to modify those instructions.

### 2.   Instructions as Given

The trial court provided CALCRIM No. 505 as follows:

> The defendants are not guilty of murder if they were justified in killing someone in self-defense or defense of another.
>
> A defendant acted in lawful self-defense or defense of another if:
>
> One:  The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;
>
> Two:  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;
>
> And three:   The defendant used no more force than was reasonably necessary to defend against the danger.
>
> Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of great bodily injury to himself or someone else.  Defendant's belief must have been reasonable and he must have acted only because of that belief.
>
> The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.
>
> When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in a similar situation, with similar knowledge, would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.
>
> "Great bodily injury" means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.
>
> The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the defendant not guilty of murder.
>
> 11 RT 2384:2 – 11 RT 2385:10.

20

The trial court provided the following instruction of CALCRIM No. 571:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendants killed someone because they acted in imperfect self-defense or imperfect defense of another.
>
> If you conclude that the defendants acted in complete self-defense or defense of another, their action was lawful and you must find them not guilty of any crime.
>
> The difference between complete self-defense or defense of another, and imperfect self-defense or imperfect defense of another, depends on whether the defendant's belief in the need to use deadly force was reasonable.
>
> A defendant acted in imperfect self-defense or imperfect defense of another if:
>
> One, the defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;
>
> And two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;
>
> But three, at least one of these beliefs was unreasonable.
>
> Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.
>
> In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.
>
> "Great bodily injury" means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm. The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another.  If the People have not met this burden, you must find the defendant not guilty of murder.

11 RT 2390:5 - 11 RT 2391:9.

No defendant objected to the jury instructions after the judge presented them.

### 3.     Court of Appeal Decision

Petitioner and Barajas first asserted on appeal that CALCRIM Nos. 505 and 571 misstated the concept of imminent peril.  The Court of Appeal disagreed, finding that California law was settled:

> For either perfect or imperfect self-defense, the defendant's fear must be of imminent harm. (*People v. Humphrey* (1996) 13 Cal. 4th 1073, 1082.)  "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not

suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S.* (1994) 7 Cal. 4th 768, 783 (*Christian S.*).)  The essence of this legal principle is contained in CALCRIM Nos. 505 and 571 by virtue of their requirement that the defendant must have believed "the immediate use of deadly force was necessary to defend against" the danger.

In *People v. Lopez* (2011) 199 Cal. App. 4th 1297, this court held that perfect or imperfect self-defense required a fear of imminent harm; future harm would not suffice. (*Id.* at pp. 1305-1306.)  We also held that the trial court was not required to define "imminent harm" because the jurors' common understanding of the term was all that was required for an understanding of the relevant legal principles. (*Id.* at 1307.)  We concluded in *Lopez* that CALCRIM Nos. 505 and 571 correctly stated the law. (*Lopez*, at p. 1307.)

*Pack*, 2012 WL 1958866 at *5.

The state court rejected Petitioner's claim that CALCRIM Nos. 505 and 571 misinstructed the jury and found no reasonable likelihood that the jurors failed to understand the difference between imminent danger and future danger or that the instructions prevented the jury from applying the theory of imperfect self-defense. *Id.* at *6.

### 4.  State Law Issue

Petitioner attempts to confuse the concepts of "imminent harm" and "future harm" in an effort to circumvent settled state law regarding jury instructions on self-defense and imperfect self-defense.  As stated above, a petitioner may not circumvent the state court's determination of a state law question by re-characterizing it as a violation of due process. *Langford*, 110 F.3d at 1389.

Petitioner first justifies his argument by quoting portions of the prosecutor's closing arguments.  When the prosecutor's closing arguments are read in their entirety and in the context of the evidence presented at trial, Petitioner's argument is not compelling.  The prosecutor never claimed that the soccer group presented only a threat of future harm: the prosecutor argued that the soccer group posed *no* threat of harm to the defendants and that the evidence did not support a finding of that the use of deadly force against the soccer group was necessary.

In addition, Petitioner never contended at trial that the shot was fired to protect the defendants from future harm.  Instead, the defense claimed imminent harm, seeking to convince the jury that one or more individuals in the soccer group had threatened the defendants either by

1    reaching for a gun hidden in his waistband or by "lunging" at one of the defendants. According
2    to the defense theory, the shooter had fired into the soccer group only after it surrounded the
3    defendants' car to prevent defendants from fleeing the scene. Defendants' attempt to characterize
4    the shooting as self-defense were overshadowed by evidence contrary to their theory, including
5    multiple witnesses who declined to accept defense counsel's attempts to elicit testimony that
6    defendants had been threatened and the dramatic recording of the entire incident by the liquor
7    store security camera. The tape showed that the shots were fired after the defendants' car had
8    backed out of its parking space toward the area in which the soccer group was congregated.
9    Instead of taking the open route to the street and safety, the car paused, and an occupant fired into
10   the soccer group. Multiple witnesses testified that Petitioner stood in the open door of the front
11   passenger compartment and taunted the soccer group by stating, "We got you," just before
12   Barajas began shooting.

13          To prevail in a collateral attack on state court jury instructions, a petitioner must prove
14   that the improper instruction "by itself so infected the entire trial that the resulting conviction
15   violated due process." *Estelle*, 502 U.S. at 72. Petitioner does not do so. The Court should
16   decline to second-guess the state court's resolution of this state law question.

17   **VI.    <u>Sufficiency of the Evidence</u>**

18          Petitioner contends his due process rights were violated by his second-degree murder
19   conviction on insufficient evidence. According to Petitioner, because the record established that
20   the Oseguera brothers and their friends were the initial aggressors and that the defendants had no
21   malice and sought only to scare off the "menacing mob," the record was not sufficient to prove
22   that defendants acted with malice, a requisite element of second-degree murder. Petitioner adds
23   that the facts supported a finding of imperfect self defense.

24          **A.    <u>Second-Degree Murder</u>**

25          "Murder is the unlawful killing of a human being . . . with malice aforethought." Cal.
26   Penal Code § 187(a). "All murder which is perpetrated by means of a destructive device or
27   explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to
28   penetrate metal or armor, poison, lying in wait, torture, or any other kind of willful, deliberate,

23

1   and premeditated killing, or which is committed in perpetration of, or attempt to perpetrate, arson,

2   rape, carjacking, robbery, burglary, mayhem kidnapping, trainwrecking, or any act punishable

3   under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of

4   discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle

5   with the intent to inflict death, is murder of the first degree.  All other kinds of murders are of the

6   second degree."  Cal. Penal Code §189.  Put another way, "[u]nder California law, "[s]econd

7   degree murder is the unlawful killing of a human being with malice aforethought but without

8   additional elements, such as willfulness, premeditation, and deliberation, that would support a

9   conviction of first degree murder.'"  *White v. Ollison*, 592 F.Supp.2d 1227, 1239 (C.D.Cal. 2008)

10  (quoting *People v. Knoller*, 41 Cal. 4th 139, 151 (2007).

11          The trial court instructed the jury that it could convict a defendant of first degree murder

12  under either of two theories: (1) "the murder was willful, deliberate, and premeditated"; or

13  (2) "the murder was committed by shooting a firearm from a vehicle intentionally at a person

14  outside the vehicle with the intent to kill that person."  11 RT 2386:18-22.  The Court stated:

15          Provocation may reduce a murder from first degree to second
16          degree, and may reduce a murder to manslaughter.  The weight and
         significance of the provocation, if any, are for you to decide.

17          If you conclude that the defendants committed murder, but were
18          provoked, consider the provocation in deciding whether the crime
         was first or second degree murder.  Also consider the provocation
19          in deciding whether the defendant committed murder or
         manslaughter.

20          11 RT 23 88:11-19.

21  **B.      State Court Decision**

22          The Court of Appeal refused "to reweigh the evidence and to conclude as a matter of law

23  that [defendants] are not guilty of murder."  *Pack*, 2012 WL 1958866 at *9.  Applying the

24  California standard of review required the court to review the record as a whole in the light most

25  favorable to the judgment to determine whether reasonable, credible, and solid evidence existed

26  from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.

27  *Id.*  The court concluded that the defendants' convictions were supported by such evidence:

28  ///

                                                    24

[T]he evidence showed that when Kevin and his friends went to the taco truck to order food, defendants shouted insults at them. Castenada pulled a gun from his waistband and pointed it at Kevin and his group of friends, telling them to back away.  Kevin and his friends began slowly backing away.  Castenada, [Petitioner] and Barajas then went to their car, got in, and drove slowly by Kevin and his friends.  [Petitioner] shouted out, "We got you," and Barajas leaned out of the rear passenger door, pointed a revolver at Kevin and his friends, and fired shots toward them.  When the shots were fired, Kevin and his friends were about 40 to 50 feet away from the car carrying defendants.  No one in the group of victims had a weapon or pretended to have a weapon.

Although the evidence shows that there were insults thrown and an altercation between the two groups, the altercation clearly was instigated by [Petitioner], Barajas, and Castenada.  There is no evidence suggesting Kevin or any of his friends provoked a quarrel.  The provocation that "incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, and it must be sufficiently provocative that it would cause an ordinary person to act rashly and without due deliberation.  (*People v. Moye* (2009) 47 Cal. 4th 537, 549-550.)  We do not view the evidence as establishing, let alone conclusively establishing, provocation that would incite an ordinary person to homicidal conduct.  (*Id.* at pp. 550-552.)

There also is little to no evidence defendants acted in the actual, but unreasonable, belief in the need to defend themselves.  Kevin and his friends were unarmed, and no one in the group pretended to be armed, and they were standing 40 feet or more away from defendants, while defendants were in a car and driving away at the time the shots were fired.  (*Christian S.*, *supra*, 7 Cal. 4th at pp. 771, 773; see *People v. Lewis* (2001) 25 Cal. 4th 610, 645.)

*Pack*, 2012 WL 1958866 at * 9-10.

## C.   Federal Standard of Review

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998).  It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict.  *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

25

When this standard is applied, there is little apparent reason to find that Petitioner's conviction was not supported by substantial evidence.  The state court accurately summarized the evidence establishing Petitioner's guilt: this Court need not repeat the same facts.  That Petitioner can point to evidence which would support a contrary conclusion does not defeat the verdict.  "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319.

In this case, there is little question that, when viewed in the light favorable to the jury's verdict, the evidence was sufficient to support Petitioner's conviction.  The Court should deny habeas relief based on insufficiency of the evidence.

**VII.  Prosecutorial Comment of Barajas' Post-Arrest Silence**

Petitioner contends that his due process rights were violated when, after Barajas testified that he had fired into the soccer group from the rear seat of Castenada's car, the prosecutor asked Barajas whether this was the first time that he had characterized himself as a shooter.  Petitioner adds that the prosecutor repeated this error in his closing.

**A.      Procedural and Factual Background**

At trial, Barajas testified for the first time that after he heard a comment that Castenada's gun was a toy, he grabbed the gun from the center console of the car and fired into the ground "to show them it was real." 8 RT 1733:6-7.  Then, after telling Castenada to get going, Barajas testified that he fired again to scare off the soccer group, some of whom were touching Castenada's car.  Although he tried to shoot away from the group, the shot struck and killed Argueta.  Barajas testified that he also shot at Garcia's car when it followed them from the parking lot.

On cross-examination, the prosecutor asked whether Barajas' testimony was the first time "we've had the opportunity to hear . . . your version of the facts of this case." 8 RT 1803:12-19.  Castenada's counsel quickly objected and requested a sidebar.  Following an off-the record

1   discussion, the Court upheld the objection, and the prosecutor asked no further questions.

2   Petitioner's counsel then asked Barajas whether he had requested an attorney following his arrest:

3   Barajas answered, "Yes, sir." 8 RT 1804:5-7. The defense then rested.

4         As a result of Barajas' testimony that he had shot from Castenada's car, the trial court

5   modified the complaint and the jury instructions to conform to the evidence. In his closing

6   argument, Barajas' counsel, Ben Jacob, criticized the prosecution for changing its theory of the

7   case. The prosecutor responded to Jacob's closing, explaining that until Barajas testified at trial

8   that he had been the defendant who shot from the white Civic, the prosecutor had no basis to

9   claim that Barajas had been the shooter. Following the prosecutor's rebuttal statement, and

10  outside the presence of the jury, all three defense attorneys objected to the prosecutor's again

11  commenting on Barajas' post-arrest silence. The trial court overruled the objection, stating (1)

12  that the prosecutor's remark in closing did not refer to Barajas' silence at arrest, and (2) that the

13  statement fairly responded to Jacob's closing by explaining which charges had been modified.

14  Defense attorneys declined the trial court's offer of a mistrial and did not ask the trial court to

15  admonish the jury.

16        **B.    State Court Opinion**

17        The Court of Appeals concluded that because only Castenada made a contemporaneous

18  objection to the prosecutor's cross-examination of Barajas and the rebuttal argument, Petitioner

19  and Barajas had forfeited this issue. *Pack*, 2012 WL 1958866 at *6. The court added that it

20  expressed no opinion "on the standing of [Petitioner] to make this objection concerning the

21  testimony of Barajas and Castenada, or of Barajas's standing to make this objection concerning

22  the testimony of Castenada." *Id.* at *7.

23        **C.    Procedural Default**

24        As previously discussed, a federal district court cannot hear a petition for writ of habeas

25  corpus unless the highest state court has had a full and fair opportunity to hear a claim. 28 U.S.C.

26  § 2254(a). When a state prisoner has defaulted on his federal claim in state court pursuant to an

27  independent and adequate state procedural rule, federal habeas review of the claim is barred

28  unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

1    alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

2    fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

3           Failure to observe California's "contemporaneous objection" rule "results in a procedural

4    default unless the petitioner can demonstrate 'cause' for his failure to raise the question at trial,

5    and 'prejudice' arising from the error.  *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir. 1981),

6    (quoting *Wainwright v. Sikes*, 433 U.S. 72, 87 (1977)).  A "contemporaneous objection rule

7    serve[s] strong state interests in the finality of its criminal litigation."  *Coleman*, 501 U.S. at 746-

8    47.  As a result, the cause and prejudice standard imposes a high bar, applying "even in cases in

9    which the alleged constitutional error impaired the truthfinding function of the trial."  *Id*. at 747.

10   The contemporaneous objection rule constitutes an "independent and adequate state ground

11   barr[ing] federal habeas . . . absent a showing of cause and prejudice."  *Id.*

12          Petitioner urges this Court to inquire "into the competence of trial counsel."  Doc. 1 at 34.

13   With regard to the prosecutor's question on cross-examination, the state court declined the same

14   invitation and found that the trial court sustained an objection made only by Castenada.  "The

15   choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on direct

16   appeal," it wrote.  *Pack*, 2012 WL 1958866 at *6 (internal quotation and citation omitted).

17          The Court of Appeal similarly rejected the claim regarding the prosecutor's rebuttal:

18                 We are also not convinced this brief and mild reference in rebuttal
                   prejudiced [Petitioner] or Barajas.  (*People v. Coffman and Marlow*
19                 (2004) 34 Cal. 4th 1, 66.)   If [Petitioner] or Barajas wishes to
                   pursue ineffective assistance of counsel, he will need to do so by
20                 way of a writ petition.  It has been said on numerous occasions that
                   a claim for ineffective assistance of counsel is more properly
21                 addressed in a petition for writ of habeas corpus.

22                 *Pack*, 2012 WL at *7.

23          Despite the state court's explicit direction that Petitioner pursue his claim of ineffective

24   assistance of counsel in a state habeas proceeding, Petitioner did not do so.  Petitioner now

25   contends that this Court should disregard his failure to do so and address the claim of ineffective

26   assistance of counsel for the first time in the federal habeas proceeding.  The Court should decline

27   to reach this issue.

28   ///

1  **VIII.**  **Cumulative Error**

2    If the Court agrees with the findings and recommendations of the undersigned, it need not

3  reach the claim of cumulative error.

4  **IX.**  **Certificate of Appealability**

5    A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a

6  district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v.*

7  *Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a

8  certificate of appealability is 28 U.S.C. § 2253, which provides:

9

10    (a) In a habeas corpus proceeding or a proceeding under section 2255
before a district judge, the final order shall be subject to review, on appeal, by

11  the court of appeals for the circuit in which the proceeding is held.

12    (b)  There shall be no right of appeal from a final order in a proceeding
to test the validity of a warrant to remove to another district or place for

13  commitment or trial a person charged with a criminal offense against the
United States, or to test the validity of such person's detention pending

14  removal proceedings.

15
  (c)  (1) Unless a circuit justice or judge issues a certificate of

16  appealability, an appeal may not be taken to the court of appeals from—

17     (A)  the final order in a habeas corpus proceeding in which the
detention complained of arises out of process issued by a State court; or

18

19     (B)  the final order in a proceeding under section 2255.

20    (2)  A certificate of appealability may issue under paragraph (1)
only if the applicant has made a substantial showing of the denial of a

21  constitutional right.

22    (3)  The certificate of appealability under paragraph (1) shall
indicate which specific issues or issues satisfy the showing required by

23  paragraph (2).

24
  If a court denies a habeas petition, the court may only issue a certificate of appealability

25  "if jurists of reason could disagree with the district court's resolution of his constitutional claims

26  or that jurists could conclude the issues presented are adequate to deserve encouragement to

27
proceed further."  *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

28

Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication.  Accordingly, the Court declines to issue a certificate of appealability.

**X.     Conclusion and Recommendation**

The undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:  __**September 7, 2016**__                    _____/s/ *Sheila K. Oberto*_____
                                                    UNITED STATES MAGISTRATE JUDGE